IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| AVAGO TECHNOLOGIES FIBER IP (SINGAPORE) PTE. LTD. et al.,<br><br>Plaintiffs,<br>v.<br><br>IPTRONICS INC. and IPTRONICS A/S,<br><br>Defendants. | CASE NO. 5:10-cv-02863 EJD<br><br>**CLAIM CONSTRUCTION ORDER** |

Plaintiff Avago Technologies Fiber IP (Singapore) Pte. Ltd. ("Avago") brings suit against Defendants IPtronics, Inc. and IPtronics A/S (collectively, "IPtronics") for infringement of U.S. Patent Nos. 5,359,447 and 6,947,456. The parties dispute the proper construction of six terms used in the claims of the patents. The court held a technology tutorial and claim construction hearing on April 3, 2012. Upon consideration of the claims, specification, prosecution history, and other relevant evidence, and after hearing the arguments of the parties, the court construes the contested language of the patents-in-suit as set forth below.

**I.  LEGAL STANDARDS**

Claim construction is a question of law to be decided by the court. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd 517 U.S. 370 (1996). Patent claims are construed in the manner that "most naturally aligns with the patent's description of the invention." Phillips v. AWH Corp., 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting Renishaw PLC v.

1

Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

The first step in claim construction is to look to the language of the claims themselves. A disputed claim term should be construed in a manner consistent with its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question." Phillips, 415 F.3d at 1312–13. Additionally, the use of the term in other claims may provide guidance regarding its proper construction. Id. at 1314.

The patentee's use of a claim term in the specification is highly relevant to understanding the proper context in which the term is used. Id. at 1315. Indeed, the specification is the "single best guide to the meaning of a disputed term." Id. (citing Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). A construction that imposes limitations not found in the claims is erroneous unless it is supported by an unambiguous restriction elsewhere in the intrinsic record. In these circumstances, "the inventor's intention, as expressed in the specification, is regarded as dispositive." Id. at 1316.

A final source of intrinsic evidence is the prosecution record and any statements made by the patentee to the United States Patent and Trademark Office regarding the scope of the invention. See Markman, 52 F.3d at 980 ("Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent."); Phillips, 415 F.3d at 1317. Because the prosecution history reflects an ongoing negotiation between the patentee and the USPTO, however, it often is difficult to determine with exact precision the scope or meaning of particular statements. Phillips, 415 F.3d at 1317. Thus, the prosecution history usually is accorded less weight than the claims and the specification. Id.

The court also may consider extrinsic evidence, such as dictionaries or technical treatises, especially if such sources are "helpful in determining the true meaning of language used in the patent claims." Phillips, 415 F.3d at 1318 (internal quotation omitted). Extrinsic evidence may aid the claim construction analysis, but cannot be used to contradict the meaning of a claim term derived from the intrinsic sources. Phillips, 415 F.3d at 1322–23.

## II. CONSTRUCTION OF DISPUTED TERMS

**"aperture larger than eight micrometers"** ('447 patent, claim 1)

| Avago's proposed construction | IPtronics's proposed construction |
|---|---|
| The opening within the layer of a VCSEL bounded by material formed in that layer that determines the outer boundary of the active area is greater than eight micrometers across in any lateral dimension. | The opening within the layer of a VCSEL bounded by material formed in that layer that determines the outer boundary of the active area is greater than eight micrometers across in all lateral dimensions. In the context of an oxide VCSEL, the layer is the oxidation layer and the aperture dimensions refer to the non-oxidized portion through which current flows. |

The parties agree that at the time the patent was filed there was no consistent naming convention for the aperture size of VCSELs. Deppe Decl. ¶ 46, ECF No. 203; Jewell Decl. ¶ 32. The references show that square-shaped apertures were often referred to by their side length. Hence a VCSEL with an 8μm × 8μm aperture was termed an "8-μm device." Deppe Decl. Ex. B, ECF No. 203.

This is a difficult term to construe. Describing an arbitrary two-dimensional shape with only one number necessarily leads to a loss of information. Thus trying to define an arbitrary two-dimensional shape by a single number necessarily gives rise to ambiguity.

While both parties' constructions are admirable for their simplicity (they are the same except that Avago says "any" while IPtronics says "all"), each definition creates problems. Avago's construction implies that the size of a square aperture is the length of its diagonal even though the only consistent convention that can be gleaned from the references is that square apertures are often referred to by the length of one side. IPtronics's construction defines an aperture by its shortest dimension, discarding the measurements most relevant to determining whether the laser will operate in multiple modes—which is the entire point of the claim. See Deppe Decl. ¶ 42, ECF No. 203.

At this time the court adopts the following construction, which addresses some deficiencies of each party's proposal at the cost of complication and incompleteness:

for an opening with two principal perpendicular axes (e.g., a square or rectangle, or an oval or ellipse): "the opening within the layer of a VCSEL bounded by material formed in that

3

CASE NO. 5:10-cv-02863 EJD
CLAIM CONSTRUCTION ORDER

layer that determines the outer boundary of the active area is greater than eight micrometers across in the longer of the two principal dimensions"

Hence a 8μm × 8μm square would have an aperture of 8μm, while a 9μm × 3μm rectangle (or an oval with a major axis of 9μm and minor axis of 3μm) would have an aperture of 9μm. This construction is consistent with the references cited, but is not sufficient to determine the aperture of many complicated shapes. Luckily, none of the references disclose VCSELs having apertures in complicated shapes. If the parties sincerely believe that further construction is needed to decide infringement or invalidity issues in this case, the court will consider revisiting the construction for good cause shown upon the motion of either party.

Finally, nothing in the patent limits the invention to oxide VCSELs or supports any sort of limitation on oxide VCSELs in particular. There does not seem to be any real dispute between the parties about which part of an oxide VCSEL is the aperture; the only disagreement is whether the court should construe the term as they apply to oxide VCSELs. Nothing in the patent supports implementation-specific limitations, so the court is loath to include such a limitation in its construction.

**"multiple transverse mode of Operation"** ('447 patent, claims 1 and 3)

| Avago's proposed construction | IPtronics's proposed construction |
|---|---|
| A mode of operation in which the emitted light from a single laser cavity or multiple filamentation includes two or more transverse modes, with at least two such modes having relative intensity sufficient to contribute to the performance of the network. | A mode of operation in which the emitted light from a single laser cavity or multiple filamentation includes two or more transverse modes, meaning the two modes are spatially separated in a transverse dimension and the weaker mode is within 30dB of the stronger mode. |

When a claim term is expressed in "general descriptive words," it is usually improper to "limit the term to a numerical range that may appear in the written description or in other claims." Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1249 (Fed. Cir. 1998). On the other hand, "when a patentee uses a claim term throughout the entire specification, in a manner consistent with only a single meaning, he has defined that term by implication." Bell Atl. Network Servs. v.

4
CASE NO. 5:10-cv-02863 EJD
CLAIM CONSTRUCTION ORDER

Covad Commc'ns Grp., Inc., 262 F.3d 1258, 1271 (Fed. Cir. 2001).

IPtronics's proposed 30dB limitation is found nowhere in the patent, but instead is derived from certain industry standards specifications. Jewell Decl. ¶ 46. Importing an intrinsically disclosed numerical limitation into the claims of the patent is disfavored under Renishaw PLC; to import an extrinsic limitation would be even more inappropriate. The court also finds that there is nothing problematic about defining limitations of the laser by reference to the performance of the network where, as here, the patent claims a network.

IPtronics does not argue the spatial separation requirement in its responsive brief. In any case, construing the term to require "spatial separat[ion]" between different modes would confuse the jury. While any single higher-order mode does exhibit something that might be called spatial separation, the several modes necessarily all originate from the same space, i.e., the aperture of the VCSEL. In that sense, a jury might wrongly conclude that a product could not infringe where the several modes are all passing through the same space at the same time.

The court adopts Avago's proposed construction.

**"power supply"** ('447 patent, claim 1)

| Avago's proposed construction | IPtronics's proposed construction |
|---|---|
| ordinary meaning, or<br><br>A source of electrical power. The electrical signal from the power supply may or may not include data. | A power source that provides a bias current to drive the laser into multiple transverse modes of operation. The power supply does not provide data. |

and

**"bias current"** ('447 patent, claim 1)

| Avago's proposed construction | IPtronics's proposed construction |
|---|---|
| ordinary meaning, or<br><br>A current which is applied to a component or device to establish a reference level for its operation. | A current supplied to the laser in an amount equal to the average of the current necessary to provide a one signal and the current necessary to provide a zero signal. |

The proposed explanatory language in IPtronics's construction of "power supply" ("that

provides a bias current to drive the laser into multiple transverse modes of operation") is a limitation on the power supply which is already included in the claim. Construing the claim to require a limitation that is already present in the claim would serve no purpose. Nor is it necessary, as both parties propose, to explain that a power supply is a "source of electrical power" or a "power source."

Hence, the only meaningful dispute is about whether the power supply may supply data. Nothing in the written description of the invention teaches that the power supply might also supply data, but neither does any part of the written description foreclose such a configuration. The preferred embodiment pictured in Figure 1 of the patent shows data coming from a separate source. The patent claims are silent as to the source of the data signal.

There is no support in the specification for a limitation on the term "power supply" about whether the electrical signal from the power supply (i.e., the bias current) contains data. The power supply may or may not supply data, though of course it must still provide a bias current. There can be no reasonable dispute that a structure identified as the power supply might also be allowed to provide a data signal altogether separate from the bias current. But if the power supply emits only one current (the bias current), any dispute about whether that current may carry data should be directed at the "bias current" term. The parties have not briefed the issue of whether a bias current may also carry data, and the court is not prepared to rule on that issue at this time.

IPtronics's proposed construction of the term "bias current" incorporates an impermissible limitation. Neither the specification nor the file history provides any support for requiring the bias current to be halfway between the one level and the zero level. The statements IPtronics cites from an oral argument in another litigation cannot limit the scope of the claim terms of the patent. Even if those statements were relevant here—and they are not—they would not support IPtronics's proposed construction because they appear to merely refer to one embodiment of the invention. It may be true that having the bias current be halfway between the one and the zero levels is the most practical way of practicing the invention, but that fact does not limit the claim.

To avoid any further dispute of this issue later in the case, and because a jury would benefit from a definition of bias current, the court tentatively adopts Avago's proposed construction rather than resting on ordinary meaning. If the parties sincerely believe that further construction of the term

6
CASE NO. 5:10-cv-02863 EJD
CLAIM CONSTRUCTION ORDER

1  "bias current" is needed to decide infringement or invalidity issues in this case—for example, with
2  respect to the data issue—the court will consider refining the construction for good cause shown
3  upon the motion of either party.

5  **"negative peaking duration"** ('456 patent, claims 12, 18, 19, and 20)

| Avago's proposed construction | IPtronics's proposed construction |
|---|---|
| the duration in time of the negative peaking transient | the duration in time of the negative peak[ing] portion as stipulated, measured from the point where the drive waveform takes a value less than the value the waveform has at the instant in time immediately before the logical '0' to the logical '1' transition begins to the point where it assumes this value again |

The parties stipulated to the following constructions:

"negative peak[ing]" means "a transient present in the VCSEL drive waveform during less than a full bit width of the logical '0' part of the current drive waveform"

"negative peak[ing] portion" means "the portion of the negative peak transient part of the drive waveform that has values below the value the waveform has at the instant in time immediately before the logical '0' to the logical '1' transition begins.

"negative peaking depth" means "the minimum value, relative to the value the waveform has at the instant in time immediately before the logical '0' to the logical '1' transition begins, of the negative peak[ing] portion."

The "negative peaking duration" is one of several parameters that the digital controller is capable of using to adjusting the drive waveform. The patent defines the "negative peaking duration" as the quantity $T_{PKW}$. '456 patent at 5:48–49. The quantity is referenced in Figure 7, which shows an example drive waveform.



Although the drawing is not very clear, the dotted line marking the leftmost bound (i.e., the beginning) of the $T_{PKW}$ parameter marks a moment in time before the drive waveform reaches the dotted line marked $I_{BIAS}$.[1] The only reasonable interpretation, then, is that it marks the moment when the '1' to '0' transition begins.

Adapting IPtronics's construction to conform to the definition provided in the specification, the court construes "negative peaking duration" to mean "the duration in time of the negative peaking transient in the drive waveform, beginning at the instant the drive waveform takes a value less than the value it maintains during a logical '1', continuing through the time when the drive waveform takes its minimum value, and ending at the moment the drive waveform again takes the

---

[1] The lowermost dotted line (marked "0%") obviously refers to the minimum value of the drive waveform current. At the trough of the bold line representing the drive waveform, that dotted line is completely covered. Similarly, the $I_{BIAS}$ dotted line is completely covered by the drive waveform after the $T_{PKW}$ period. But the leftmost dotted line representing the beginning of the $T_{PKW}$ period is not similarly covered at the time at which the drive waveform crosses $I_{BIAS}$. Rather, the leftmost dotted line is distinctly visible adjacent to the waveform above the $I_{BIAS}$ line. IPtronics's expert agrees with this conclusion, yet somehow comes to a different construction by adding a new line to the drawing in the patent. See Jewell Decl. ¶¶ 80–82.

CASE NO. 5:10-cv-02863 EJD
CLAIM CONSTRUCTION ORDER

value that it will maintain until the logical '0' to logical '1' transition begins." Construing the claim in a materially different way would necessarily be inconsistent with Figure 7.

**"digital controller"** and **"integrated digital controller"** ('456 patent, claims 4, 5, 8, 15, 18, and 19)

| Avago's proposed construction | IPtronics's proposed construction |
|---|---|
| A "digital controller" is electronic circuitry that uses digital data to control the properties of the drive waveform.<br><br>A digital controller is "integrated" if it is interconnected with, and either inseparably associated with or on the same supporting material as the laser driver. | Electronic circuitry that is located on the same chip as the laser driver and that programs the properties of the drive waveform using digital data. |

Because some of the claims refer to a "digital controller" and some refer to an "integrated digital controller," the terms "integrated" and "digital controller" must be construed separately. The parties' constructions of "digital controller" are very similar, but Avago's is preferable because it does not introduce the new term "program" to the claim.

A person having ordinary skill in the art reading the '456 patent would understand "integrated" to mean "on the same chip." In the "Summary of Invention," the patent describes that "the digital controller is integrated *into* the driver IC [integrated circuit]." '456 patent at 3:32–33 (emphasis added). Although hybrid integrated circuits exist (and existed at the time the patent was filed), they are the exception to the ordinary meaning of "integrated circuit," which usually refers to a monolithic circuit. Jewell Decl. ¶ 84. Elsewhere, the specification discloses that "one aspect of the present invention is the integration of a digital controller *in* the laser driver." '456 patent at 5:22–24 (emphasis added). For the digital controller to be integrated "into the driver IC" or "in the laser driver," a person having ordinary skill in the art would understand that the digital controller was also on the chip.

//
//

United States District Court
For the Northern District of California

Accordingly, the court adopts Avago's construction of the term "digital controller," and construes "integrated" to mean "on the same chip."

**IT IS SO ORDERED.**

Dated: September 4, 2012


EDWARD J. DAVILA
United States District Judge