1
2
3
4
5
6
7
8
9
10
11
12

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| AVAGO TECHNOLOGIES U.S. INC., AVAGO TECHNOLOGIES GENERAL IP (SINGAPORE) PTE. LTD., AVAGO TECHNOLOGIES TRADING LTD., AND AVAGO TECHNOLOGIES INTERNATIONAL SALES PTE. LTD., | Case No.:  5:10-CV-02863-EJD (PSG) |
| | **REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE IN CIVIL OR COMMERCIAL MATTERS** |
| Plaintiffs, | |
| v. | Honorable Paul S. Grewal |
| IPTRONICS INC., MELLANOX TECHNOLOGIES DENMARK APS (f/k/a IPTRONICS A/S), | |
| Defendants. | |

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1.      **Sender**

The Honorable Paul S. Grewal
United States Magistrate Judge
United States District Court for the Northern District of California
San Jose Division
280 South 1st Street
San Jose, CA 95113
United States of America

2.      **Central Authority of the Requested State**

Central Authority in the Canton of Zurich
Obergericht des Kantons Zurich
Internationale Rechtshilfe
Hirschengraben 15
Postfach 2401
8021 Zurich
Switzerland

3.      **Person to Whom the Executed Request Is to Be Returned**

Marc Veit
LALIVE
Stampfenbachplatz 4
P.O. Box 212
8042 Zurich
Switzerland
Telephone:  +41 58 105 2100
Facsimile:  +41 58 105 2160
E-mail:  mveit@lalive.ch

4.      **Specification of the Date by Which the Requesting Authority Requires Receipt of the Response to the Letter Request**

By December 31, 2014, or as soon as reasonably practicable.  The U.S. District Court for the Northern District of California has scheduled a procedural hearing on February 5, 2015, for which the parties need to file a statement by January 26, 2015.

The evidence cutoff date is March 2, 2015.

1

4839-0505-3982.1

**IN CONFORMITY WITH ARTICLE 3 OF THE CONVENTION, THE UNDERSIGNED APPLICANT HAS THE HONOR TO SUBMIT THE FOLLOWING REQUEST:**

     **5.**    **a.**    **Requesting Judicial Authority (Art. 3(a))**

United States District Court for the Northern District of California
San Jose Division
280 South 1st Street
San Jose, CA 95113
United States of America

          **b.**    **To the Competent Authority of (Art. 3(a))**

Central Authority in the Canton of Zurich
Obergericht des Kantons Zurich
Internationale Rechtshilfe
Hirschengraben 15
Postfach 2401
8021 Zurich
Switzerland

          **c.**    **Name of the Case and Any Identifying Number**

*Avago Technologies Fiber IP (Singapore) Pte. Ltd. v. IPtronics, Inc. and IPtronics A/S*; Case Number 5:10-CV-02863 EJD (PSG), United States District Court for the Northern District of California.

     **6.**    **Name and Addresses of the Parties and Their Representatives (Art. 3(b))**

          **a.**    **Plaintiffs**

Avago Technologies Fiber IP (Singapore) Pte. Ltd.
No. 1 Yishun Avenue 7
Singapore 768923
Singapore
Telephone: 65-6755-7888

Avago Technologies U.S. Inc.
350 West Trimble Road, Building 90
San Jose CA 95131
USA
Telephone: (408) 435-7400

Avago Technologies General IP (Singapore) PTE. LTD.
1 Yishun Avenue 7
Singapore, 768923
Singapore
Telephone: 65-6755-7888

2

4839-0505-3982.1

Avago Technologies Trading LTD.
4th Floor, IBL House
Caudan
Port Louis
Mauritius

Avago Technologies International Sales PTE. LTD.
1 Yishun Avenue 7
Singapore, 768923
Singapore
Telephone: 65-6755-7888

***Counsel for the Plaintiffs***

John C. Vetter
Foley & Lardner LLP
Two South Biscayne Boulevard, Suite 1900
Miami, FL 33151
Telephone: (305) 382-8424
Fax: (305) 482-8600
E-mail: JVetter@Foley.com

Shawn E. McDonald
Ary Chang
3579 Valley Centre Drive, Suite 300
San Diego, CA  92130
Telephone: (858) 847-6700
Facsimile:  (858) 792-6773
E-mail: SEMcDonald@Foley.com
E-mail: AChang@Foley.com

Marc Veit
LALIVE
Stampfenbachplatz 4
P.O. Box 212
8042 Zurich
Switzerland
Telephone:  +41 58 105 2100
Facsimile:  +41 58 105 2160
E-mail:  mveit@lalive.ch

**b.     Defendants**

IPtronics, Inc.
1370 Willow Road
2nd Floor
Menlo Park, California 94025
Telephone: 650-681-9653

3

4839-0505-3982.1

Mellanox Technologies Denmark ApS
Ledreborg Allé 130B
DK-4000 Roskilde
Denmark
Telephone: +45 4632 8434


**Counsel for the Defendants**

Steven D. Hemminger
Xavier Brandwajn
Alston & Bird LLP
1950 University Avenue, 5th Floor
East Palo Alto, CA 94303
Email: steve.hemminger@alston.com
Email: xavier.brandwajn@alston.com

Brian Parker Miller
Alston & Bird LLP
1201 W Peachtree St.
Atlanta, GA 30309
Email: parker.miller@alston.com

Thomas W. Davison
Alston & Bird LLP
950 F Street, NW
Washington, DC 20004-1404
Email: tom.davison@alston.com


7.    **Identity of Persons from Whom Evidence Is to Be Gathered (Art. 3(e)**

II-VI Laser Enterprise GmbH
Binzstrasse 17
CH-8045 Zurich
Switzerland

and

Mr. Karlheinz Gulden
Executive Director and Product Manager
II-VI Laser Enterprise GmbH
Binzstrasse 17,
CH-8045 Zurich,
Switzerland
Telephone:  +41444571124

4

4839-0505-3982.1

8.    a.    **Nature of the Proceedings (Art. 3(c))**

This is a civil action with claims arising in part under the Patent Laws of the United States, 35 U.S.C. § 1 et *seq.*, and, in particular, 35 U.S.C. § 271; under the Trademark Act of 1946, as amended, 15 U.S.C. §§ 1051-1141 (the "Lanham Act"), and in particular 15 U.S.C. § 1125 (§ 43(a) of the Lanham Act); and under the State of California's Uniform Trade Secrets Act §§3426 *et seq.*

b.    **Summary of the Complaint (Art. 3(c))**

i.    **Summary of the Relevant Procedural History**

On June 29, 2010, Avago Technologies Fiber IP (Singapore) Pte. Ltd. ("Avago Fiber IP") filed a Complaint against IPtronics, Inc. and IPtronics A/S (collectively, "IPtronics") in the United States District Court for the Northern District of California, alleging various acts of patent infringement.

On September 18, 2012, Avago Fiber IP filed its Second Amended and Supplemental ("SASC") complaint to join Avago Technologies U.S. Inc. ("Avago US"), Avago Technologies General IP ("Avago General IP"), Avago Technologies International Sales Pte. Ltd. ("Avago Sales"), and Avago Technologies Trading Ltd. ("Avago Trading") (collectively, "Avago Licensees"), which have exclusive rights in the patents-in-suit to this action.  The SASC included the original allegations that IPtronics (i) contributorily infringed and actively induced infringement of one or more claims of United States Patent No. 5,359,447 (the "'447 Patent"), which Avago Fiber IP owns, and (ii) directly infringed, contributorily infringed, and actively induced infringement of one or more claims of United States Patent No. 6,947,456 (the "456 Patent"), which Avago Fiber IP owns.  The SASC also added factual allegations and related claims against IPtronics for violations of 15 U.S.C. § 1125 (§ 43(a) of the Lanham Act), misappropriation of trade secrets under the State of California's Uniform Trade Secrets Act §§ 3426 *et seq.*, and unlawful, unfair, or fraudulent business act or practices under California Business & Professional Code § 17200.

Effective October 29, 2012, Avago Fiber IP transferred ownership of the patents-in-suit to Avago General IP, and Avago Fiber IP ceased to exist.

4839-0505-3982.1

On July 1, 2013, Mellanox Technologies Ltd. acquired defendant IPtronics A/S, now known as Mellanox Technologies Denmark ApS, which becomes a wholly owned subsidiary of Mellanox Technologies Ltd.

### ii.    Summary of the Relevant Facts

The following summary is a highly simplified explanation of an extremely complicated technology.  The summary is offered only for the purposes of this Letter Rogatory to assist the Receiving Authority in understanding the relevant issues in this matter.

High-speed optical data links are used in high-performance computers and data centers for optical switching and information transfer and retrieval.  They are used in many possible applications.  One such application is in transferring information exchanged through the Internet. These types of optical data links represent optical communication networks.

In its Complaint and the SASC, Avago alleges that IPtronics has marketed and sold into the United States various driver circuits for Vertical Cavity Surface Emitting Lasers and components for use in optical communication networks.  These products use light to transmit strings of 1's and 0's representing data, typically between computers.  Today's products typically operate at astounding speeds – they can transmit several *billion* 1's and 0's *per second*.  The figure below illustrates the basic elements of an optical data communication network that uses VCSELs to transmit digital information, *i.e.*, 1's and 0's, via fiber optics.



**Figure 1.  Schematic of the basic elements of an optical data communication network that uses VCSELs.**

Moving from left to right in Figure 1, a laptop computer is an example of a data source that provides a data signal (a pattern of digital 1's and 0's) representing the information to be

REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE
CASE NO. 5:10-CV-02863-EJD

4839-0505-3982.1

1    transmitted.  That data is input to an electronic circuit known as a Laser Driver (item 100 above).  In

2    response to the incoming data stream, the Laser Driver circuit outputs an electrical current known as

3    a "Drive Waveform" (item 112 above) that powers a laser (item 120 above).  The Drive Waveform

4    varies between a high level of electrical current (representing a "1" in the original incoming data

5    signal) and a low level of electrical current (representing a "0" in the original incoming data signal).

6         The Drive Waveform generated by the Laser Driver energizes the laser, causing it to emit a

7    beam of light that varies in intensity (brightness) in proportion to the amount of electrical current

8    provided.  The Laser Driver provides the bias current to drive the VCSEL to generate and emit the

9    multimode light.  The data can be sent as optical light pulses using a VCSEL, which is represented

10   in Figure 1 by the block diagram labeled "Laser Array."  The way a VCSEL generates the light to

11   send the data with low error rate is important to the operation of the optical data communication

12   network.  Those light signals are carried over a multimode optical medium (such as a fiber optic

13   cable in Figure 1) that is coupled to the VCSEL on one end and to a receiver on the other.  The

14   receiver is comprised of detectors and a transimpedance amplifier (TIA) that turn the optical light

15   pulses back into a stream of digital 1's and 0's at the other end.  In Figure 1, the second computer on

16   the right is the recipient of the data.

17        VCSELs are extremely small semiconductor lasers that emit light perpendicular to their chip

18   surface (hence "surface emitting").  They comprise many layers of semiconductor materials.  Figure

19   2 provides an extremely simplified and not-to-scale schematic of a center cross section of a VCSEL.

20   Each VCSEL contains one or more layers in which the structure of the layer surrounding a central

21   portion has been modified to leave a central region defining an oxide "aperture" or opening through

22   which the light is emitted.  See "Oxide Aperture" in Figure 2.  The VCSEL layers and oxide

23   aperture are not visible to the naked eye.  The oxide aperture causes the VCSEL to operate in

24   multiple transverse modes.

25        Along with the bias current, the size of the VCSEL aperture is a critical feature for the

26   VCSEL to operate in multiple transverse modes.  Multiple transverse modes are created when the

27   VCSEL lases in multiple spots within the oxide aperture.  This lasing in multiple spots is what

28   reduces the error rate of the optical data transmission  when the multimode VCSEL is coupled to a

multimode fiber (see Figure 1).  A single mode VCSEL, in contrast, that uses a smaller aperture size would lase in only one single spot within the oxide aperture.  If coupled to a multimode fiber, the single mode VCSEL would cause greater error rate in the multimode fiber.  Older VCSEL production technology, *i.e.*, proton implantation, generally requires aperture sizes greater than 8 microns to operate in multiple transverse modes (*i.e.*, in multiple spots).  An oxide aperture VCSEL can generate multiple transverse modes at sizes smaller than 8 microns.

As previously explained, a VCSEL (which is a single laser in the laser array in Figure 1) consists of many layers of semiconductor material; these layers are grown or formed parallel to a substrate.  The composition and thicknesses of the various VCSEL layers are specified by an epitaxial recipe.  In other words, the epitaxial recipe provides the design instructions to produce each semiconductor layer of the VCSEL.  The compositions of these layers are critical to the operation of the VCSEL.  When the VCSEL is subjected to heat and steam, the aluminum gallium arsenide oxidizes from the outside in, forming an aperture in the center of the oxide layer (see "Oxide Aperture" in Figure 2).  In forming the oxide aperture, the specific aluminum composition of the starting aluminum gallium arsenide (AlGaAs) material is known to play a critical role in both the oxidation speed and the oxide aperture shape (as seen from the view looking down on the VCSEL).  For example, oxide apertures formed from aluminum arsenide tend to be square apertures, while oxide apertures formed from aluminum gallium arsenide with less than 97% aluminum tend to be more circular in shape.

8

4839-0505-3982.1



**Figure 2. Simplified Schematic Showing Center Cross Section of Oxide VCSEL.**

In Figure 2, metal contacts are provided on the top and bottom of the VCSEL so that electrical current can pass through it.  VCSELs from II-VI Laser Enterprise GmbH (the company from which evidence is sought, "II-VI") are "oxide confined," as are many commercial embodiments.  The top and bottom mirrors of the VCSELs are made of aluminum gallium arsenide (AlGaAs) layers.  Because the layer to form the oxide aperture has the highest aluminum content of the AlGaAs layers exposed, its oxidation rate is also the highest.  Oxidation is continued until the unoxidized portion in the high aluminum content layer is of the desired dimension.  The dimension of this unoxidized portion is what is known as the oxide "aperture" of the VCSEL.

"Aperture" is a term used by persons of skill in the art to refer to the unoxidized portion of a layer in a VCSEL that confines current flow, and thus the path of the light emitted by the active region of a VCSEL.  In this case, the U.S. District Court for the Northern District of California has construed the term "aperture" to mean the following:

REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE
CASE NO. 5:10-CV-02863-EJD

4839-0505-3982.1

> [F]or an opening with two principal perpendicular axes (*e.g.*, a square or rectangle, or an oval or ellipse): "the opening within the layer of a VCSEL bounded by material formed in that layer that determines the outer boundary of the active area is greater than eight micrometers across in the longer of the two principal dimensions."
>
> Hence a 8μm × 8μm square would have an aperture of 8μm, while a 9μm × 3μm rectangle (or an oval with a major axis of 9μm and minor axis of 3μm) would have an aperture of 9μm.

As described above, if the VCSEL is square in shape, the length of one side of the square would be the size of the oxide aperture.  If the shape of the VCSEL is a rectangle, then the length of the longer side would be considered the size of the oxide aperture.  If the shape of the VCSEL is an oval, then the length of the major axis of the oval would be considered the size of the oxide aperture.  Thus, based upon the way the U.S. District Court for the Northern District of California has construed the term "aperture," evidence regarding the shape of the oxide aperture is necessary to identify which dimension is used to determine the size of the oxide aperture.

Aperture dimensions can have a range of acceptable values or tolerances.  Oxidation of the high AlGaAs layer is a physical process of limited precision.  Based on these tolerances and other considerations, manufacturers develop an acceptable range of values for their oxide apertures in which the VCSELs will perform satisfactorily.  That range may well be over 10% to 15% of the oxide aperture dimension.  For example, if a target oxide aperture is 7.8 microns, an acceptable tolerance may be close to 9 microns.  Tens of thousands of VCSELs can be produced simultaneously on a small substrate.  These substrates are also often called "wafers."  Quality testing, including aperture measurement and mapping, can then be done on multiple VCSELs on a wafer.

VCSEL manufacturers perform testing for device performance and control through established processes that also include determining production yield.  Because the oxide aperture size is an important parameter, this parameter also affects the yield of usable VCSELs from a given wafer.  Bad devices are marked for removal during the testing process.  Oxide apertures for a given wafer may vary over a range that would be greater than acceptable for use in a single product.  In this case, the oxide VCSELs may be separated for use in different products, depending on their

4839-0505-3982.1

measured oxide aperture size.  This process of separating devices based on their measured oxide aperture size for use in different products is known as "binning."  Wafer and lot variations can contribute to binning as well.

### iii.  What Is Claimed by the '447 Patent

In general terms, the '447 Patent covers the invention of an optical communication network having a VCSEL operating in a certain way to achieve high speed, accurate optical data transmission.  The invention of the '447 Patent covers at least an optical communication network that includes (1) a VCSEL or VCSEL array with an aperture larger than eight microns through which an optical signal is emitted; (2) a power supply that provides a bias current, for example, a laser driver, that drives the VCSEL into multiple transverse mode of operation, where the VCSEL emits optical signal through the aperture in response to a signal carrying data from the laser driver; (3) a multimode optical medium such as a fiber optic cable coupled to the VCSEL to carry the optical signal from the VCSEL to the receiver.  A true and correct copy of the '447 Patent, which includes a more detailed description of the invention covered, is attached hereto as Exhibit 2.

### iv.  IPtronics' Alleged Infringement of the '447 Patent

There are two types of indirect infringement:  contributory infringement and active inducement infringement.  To prove either type of indirect infringement, direct infringement must be shown.  There are two types of direct infringement:  literal infringement and infringement under the doctrine of equivalents.  To prove direct infringement by literal infringement, the products must be compared with each and every requirement of the claim to determine whether all requirements of that claim are met.  If a product does not literally infringe a claim, there can still be direct infringement if that product satisfies that claim under the doctrine of equivalents.  Under the doctrine of equivalents, a product infringes a claim if the product performs substantially the same function and works in substantially the same way to achieve substantially the same result as the requirement of the claim.

### (A.)  Contributory Infringement

IPtronics is allegedly liable for contributory infringement of the '447 Patent because it allegedly sells, offers to sell, and imports within the United States its accused laser drivers and

11

4839-0505-3982.1

TIAs.  See "Laser Driver" and "Receiver" in Figure 1.  IPtronics allegedly sells its laser drivers and TIAs to its customers, who allegedly directly infringe claims of the '447 Patent by manufacturing the optical communication networks.  These customers allegedly include Mellanox Technologies Ltd., FCI SA, TE Connectivity (formerly Tyco Electronics Corporation), Emcore Corporation, Sumitomo Electric Device Innovations U.S.A., Inc., Reflex Photonix, Inc., and Finisar Corporation. These IPtronics laser drivers and TIAs allegedly have no substantial, noninfringing use.  The IPtronics laser drivers and TIAs allegedly constitute a material part of the claims of the '447 Patent. IPtronics is allegedly aware of the '447 Patent and allegedly knows that the optical communication networks for which the IPtronics laser drivers and TIAs are components allegedly have no other substantial, noninfringing use.

II-VI VCSELs are allegedly known to be used in the same products made by IPtronics customers whose optical communication network products allegedly directly infringe the '447 Patent.  These products allegedly also contain IPtronics laser drivers and TIAs.  The optical communication network is described in Figure 1, with the IPtronics products represented by the labels "Laser Driver" and "Receiver," and with II-VI's products represented by the label "Laser Array."

II-VI VCSELs allegedly do not bear a stamp of the VCSEL part numbers specified in the product datasheets, so it is allegedly not apparent to an outside observer which VCSEL part numbers correspond to which VCSELs that are inside of an optical communication network.  From the VCSEL product names and descriptions and from other product information such as the data transfer speed, multimode operation, and the wavelength, the following II-VI VCSEL products are allegedly as described in the '447 Patent:  10G Array – Top Bottom Contact – 850nm 10Gb/s Multimode VCSEL chip array – APA7301040000, APA7301120000 (a true and correct copy of a datasheet is attached hereto as Exhibit 3); 10G Dual Top Contact – 850nm 10Gb/s Multimode Dual Top Contact VCSEL Array – APA4301010001, APA4301040001, APA4301120001 (a true and correct copy of a datasheet is attached hereto as Exhibit 4); 10G Chip – 850nm 10Gb/s Multi-Mode VCSEL chip – APA7501010005 (a true and correct copy of a datasheet is attached hereto as Exhibit 5); 14G Top Bottom Contact – 850nm 14Gb/s Multimode VCSEL Chip Singlet and Array –

12

4839-0505-3982.1

APA7601010001, APA7601040001, APA7601120001 (a true and correct copy of a datasheet is attached hereto as Exhibit 6); 14G Dual Top Contact – 850nm 14Gbs/ Multimode Dual Top Contact VCSEL Chip Singlet and Array – APA4401010001, APA4401040001, APA4401120001 (a true and correct copy of a datasheet is attached hereto as Exhibit 7); 10G LC TOSA – 850nm 10Gb/s Multimode VCSEL LC TOSA – APA7301012000 (a true and correct copy of a datasheet is attached hereto as Exhibit 8); and 850nm 10Gb/s Multimode Flip Chip VCSEL Array – APA4201040000, APA4201120000 (a true and correct copy of a datasheet is attached hereto as Exhibit 9).

### (B.)    Actively Induced Infringement

IPtronics also allegedly actively induced its customers' infringement of the claims of the '447 Patent.  IPtronics customers (*e.g.*, Mellanox Technologies Ltd., FCI SA, TE Connectivity (formerly Tyco Electronics Corporation), Emcore Corporation, Sumitomo Electric Device Innovations U.S.A., Inc., Reflex Photonix, Inc.) allegedly directly infringed the asserted claims by manufacturing the infringing optical communication networks, which include VCSELs and laser drivers and TIAs.  IPtronics allegedly took action intending to cause the infringing acts by their customers by teaching and enabling their customers to use the VCSELs with IPtronics' laser drivers and TIAs in optical communication networks.  IPtronics has allegedly been aware of the '447 Patent before the filing of this lawsuit and allegedly knew that their customers' manufacture of the optical communication networks would constitute infringement of the '447 Patent.

If these IPtronics customers used in their optical communication networks VCSELs with oxide apertures greater than 8 microns, then the optical communication networks allegedly directly infringe claims of the '447 Patent.  If the VCSELs are 8 microns or smaller, then the optical communication networks allegedly directly infringe claims of the '447 Patent under the doctrine of equivalents.

### v.    What Is Claimed in the '456 Patent

In general terms, the '456 Patent covers laser driver circuits, such as the Laser Driver described with reference to Figure 1, above, and optical transmitters containing them.  As depicted in Figure 1, above, in response to the incoming data stream, the Laser Driver circuit outputs an electrical current known as a "Drive Waveform" that powers a VCSEL laser.  The Drive Waveform

13

varies between a high level of electrical current (representing a "1" in the original incoming data signal) and a low level of electrical current (representing a "0" in the original incoming data signal). The Drive Waveform output from the Laser Driver is connected to the VCSEL and energizes the laser, causing it to emit light that varies in intensity (brightness) in proportion to the amount of electrical current provided.

The Laser Drivers recited in the asserted claims of the '456 patent cause "negative peaking" of the Drive Waveform electrical signal, meaning that when the Laser Driver changes the outputted Drive Waveform from the high level of electrical current (representing a "1" in the original incoming data) to the low level of electrical current, also known as the "Bias" current (representing a "0" in the original incoming data), it temporarily reduces the level of the Drive Waveform to a level of current below the Bias current level.  This negative peaking improves the performance of the VCSEL, by causing its light output to transition from the high level to the low level more quickly, permitting higher rates of data transmission than would be possible without negative peaking.  The negative peaking results in a "Negative Peak Portion" of the electrical Drive Waveform that temporarily dips below the Bias current level, and then rises up to Bias current level. This Negative Peak Portion required by each of the asserted claims of the '456 patent, and is depicted in Fig. 7 of the '456 Patent (shown directly below) as the portion of the waveform inside the dashed box, below the Bias current level ("$I_{BIAS}$").



14

An electronic model of the electrical properties of a VCSEL is necessary for simulating the behavior of the electrical circuit in which the VCSEL operates, *i.e.*, to simulate the Drive Waveform signal of electrical current flow between the Laser Driver and the VCSEL using a commercial modeling software package accepted in this industry, such as SPICE or CADENCE.  The evidence sought from II-VI relating to its electronic models for its VCSELs is necessary for modeling the electrical behavior of those of the accused products that contain an II-VI VCSEL as proof that such products infringe the '456 Patent, including proof that the electrical waveform generated when an II-VI VCSEL is connected to the Laser Driver includes a negative peak portion, as is required by each of the asserted claims of the '456 Patent.  A true and correct copy of the '456 Patent, which includes a more detailed description of the invention covered, is attached hereto as Exhibit 2.

### iv.    IPtronics' Alleged Infringement of the '456 Patent

IPtronics is alleged to infringe the '456 Patent both directly and indirectly.  IPtronics' acts of alleged direct infringement of the '456 Patent are not the subject of this Request.  The requested evidence relates to the use of VCSELs made by II-VI and sold to customers who then combine the VCSELs with an IPtronics Laser Driver, upon the instruction of IPtronics, and thereby create an optical transmitter that is alleged to directly infringe the '456 Patent.  These customers allegedly include Mellanox Technologies Ltd., FCI SA, TE Connectivity (formerly Tyco Electronics Corporation), Emcore Corporation, Sumitomo Electric Device Innovations U.S.A., Inc., Reflex Photonix, Inc., and Finisar Corporation.  It is alleged that IPtronics took actions intending to cause the infringing acts by their customers by teaching and enabling their customers to use the VCSELs with IPtronics' Laser Drivers to create the optical transmitters alleged to infringe the '456 Patent, including specific instructions by IPtronics to configure the Laser Driver so that Drive Waveforms generated include the Negative Peak Portion required by each of the asserted claims of the '456 Patent.  IPtronics has allegedly been aware of the '456 Patent since before the filing of this lawsuit and allegedly knew that their customers' manufacture of the optical transmitters would constitute infringement of the '456 Patent.

The evidence sought from II-VI includes the most current final electronic model for each of its VCSELs that are used to model or simulate the electrical behavior of the accused products that

15

4839-0505-3982.1

contain an II-VI VCSEL combined with an IPtronics Laser Driver, modeled using a commercial modeling software package accepted in this industry, such as SPICE or CADENCE. This evidence and the modeling results using the evidence are proof that such products infringe the '456 Patent, including proof that the electrical waveform generated when an II-VI VCSEL is connected to the Laser Driver includes a negative peak portion, as is required by each of the asserted claims of the '456 Patent.

### 9.    a.    Evidence to Be Obtained (Art. 3(d))

The evidence to be obtained includes (i) oral testimony from Mr. Karlheinz Gulden, Executive Director and Product Manager at II-VI Laser Enterprise GmbH ("II-VI"; formerly Oclaro Switzerland GmbH), and (ii) documents from II-VI. Schedule A, attached as Exhibit 1 hereto, sets forth a list of questions to be asked of the witness.

The oral testimony from Mr. Gulden being requested contain necessary information regarding oxide VCSELs used in optical communication networks which directly infringe the asserted claims of the '447 Patent and the '456 Patent, and to which IPtronics was and is liable for contributory infringement and actively induced infringement. As the Product Manager at II-VI, Mr. Gulden was responsible for overseeing a team of engineers and technicians who work on the design, manufacture and production of oxide VCSEL products. These manufacturing and production processes include design and monitoring of epitaxial recipes and fabrication processes that involve the formation of an oxide aperture, electronic simulation and modeling of the electrical behavior of the II-VI VCSELs, among other things. As well, these processes would require ensuring production within the tolerance of the VCSEL's oxide aperture size, which must necessarily require testing to determine production yield. In his work capacity, Mr. Gulden must also know that there is a product specification for an oxide aperture size for the II-VI VCSELs.

The documents requested from II-VI contain necessary information regarding oxide VCSELs used in optical communication networks which directly infringe the asserted claims of the '447 Patent and the '456 Patent, and to which IPtronics was and is liable for contributory infringement and actively induced infringement. There is a Protective Order in this case wherein

4839-0505-3982.1

confidential, proprietary, or private information is protected from public disclosure and may only be used for the purposes of preparation and litigation of this matter and may not be used for any other purpose.  A copy of the Protective Order is attached hereto as Exhibit 10.  II-VI may designate its documents as specified under the provisions of this Protective Order as containing confidential material.

The documents requested from II-VI are as follows and are necessary for the following reasons:

1.     **The most current final version of VCSEL "oxidation specifications" in effect on or before June 24, 2013 reflecting the specification of the oxide aperture size, range of sizes, and oxide aperture shapes for the following products:**

a.     **10G Array – Top Bottom Contact – 850nm 10Gb/s Multimode VCSEL chip array – APA7301040000, APA7301120000 (a true and correct copy of a datasheet is attached hereto as Exhibit 3);**

b.     **10G Dual Top Contact – 850nm 10Gb/s Multimode Dual Top Contact VCSEL Array – APA4301010001, APA4301040001, APA4301120001 (a true and correct copy of a datasheet is attached hereto as Exhibit 4);**

c.     **10G Chip – 850nm 10Gb/s Multi-Mode VCSEL chip – APA7501010005 (a true and correct copy of a datasheet is attached hereto as Exhibit 5);**

d.     **14G Top Bottom Contact – 850nm 14Gb/s Multimode VCSEL Chip Singlet and Array – APA7601010001, APA7601040001, APA7601120001 (a true and correct copy of a datasheet is attached hereto as Exhibit 6);**

e.     **14G Dual Top Contact – 850nm 14Gbs/ Multimode Dual Top Contact VCSEL Chip Singlet and Array (a true and correct copy of a datasheet is attached hereto as Exhibit 7);**

g.     **10G LC TOSA – 850nm 10Gb/s Multimode VCSEL LC TOSA– (a true and correct copy of a datasheet is attached hereto as Exhibit 8); and**

17

4839-0505-3982.1

1           **h.**      **850nm 10Gb/s Multimode Flip Chp VCSEL Array – APA4201040000,**

2   **APA4201120000 (a true and correct copy of a datasheet is attached hereto as Exhibit**

3   **9).**

4           Oxidation specifications are standard industry procedures used in the production of oxide

5   VCSELs.  As a manufacturer of oxide VCSELs, II-VI utilizes these documents in their production.

6   This evidence is necessary to prove design specification and design tolerances for the oxide aperture

7   sizes, which would show whether the final products in which these VCSEL products are a

8   component would infringe claims of the '447 Patent literally or under the doctrine of equivalents.

9   The information on the shape of the oxide aperture is necessary because the U.S. District Court for

10   the Northern District of California's construction of the term "aperture" is dependent upon its shape.

11   The evidence is relevant to show one element, relating to VCSEL aperture size, of asserted claims of

12   the '447 Patent.  The oxide aperture size and shape are information necessary to show infringement

13   by the IPtronics customer.  II-VI VCSELs are known to be used in products used by IPtronics

14   customers whose optical communication network products directly infringe the '447 Patent.  II-VI

15   VCSELs do not bear a stamp of the VCSEL part numbers specified in the product datasheets.  From

16   the product names and product descriptions of the II-VI oxide VCSELs listed above, the data

17   transfer speeds, the operation in multimode, and the wavelength all show that the VCSEL products

18   listed in this Request are described in the '447 Patent.  Therefore the information is necessary to

19   prove infringement of the '447 Patent.

20           **2.**      **The most current final version on or before June 24, 2013 of the epitaxial recipe**

21   **specifying the aluminum gallium arsenide (AlGaAs) structure used in the formation of the**

22   **oxide aperture of the VCSEL referenced in Requests 1(a)-(h), above.**  As a VCSEL

23   manufacturer, II-VI necessarily uses information provided by the epitaxial recipes in the epitaxial

24   production of its VCSELs because the epitaxial recipe is the standard among manufacturers and is

25   required to document the specific material structure of each VCSEL product, including the material

26   composition of each layer.  This evidence is necessary to verify the variations in the oxide aperture

27   sizes and shapes among the different products using different epitaxial recipes.  This evidence is

28   relevant to show infringement by IPtronics' customers who use these VCSELs in their systems

18

4839-0505-3982.1

because the epitaxial recipe can be used to verify the shape of the oxide aperture.  As construed by the U.S. District Court for the Northern District of California, the VCSEL aperture, which is required to determine whether there is direct infringement literally or under the doctrine of equivalents, size is dependent on the oxide aperture shape.  In forming the oxide aperture, the specific aluminum composition of the starting aluminum gallium arsenide (AlGaAs) material is known to play a critical role in both the oxidation speed and the oxide aperture shape.  The epitaxial recipe provides the material composition of each layer, including the oxide layer and, thus, will provide evidence to verify the oxide aperture shape.

3.      **Production yield results from the most recent three-month period on or before June 24, 2013 for which data has been collected relating to oxide aperture sizes from the quality assurance and quality control processes applicable to the VCSEL products referenced in Requests 1(a)-(h) above.**  This type of test result is a critical aspect in VCSEL manufacturing to maintain production yield and to reduce cost.  This information is one piece of evidence necessary to verify the fraction of VCSEL products with oxide apertures greater than 8 microns, which determines how many of the final products infringe literally and how many infringe under the doctrine of equivalents.  This evidence is relevant to show how many VCSELs used by IPtronics' customers in the infringing optical communication networks infringe literally and how many infringe under the doctrine of equivalents.  In part based upon this evidence, the amount of damages from literal infringement and from infringement under the doctrine of equivalents of products using II-VI VCSELs will be separately calculated.

4.      **Document(s) from the most recent three-month period on or before June 24, 2013 corresponding to the same time period as documents from Request No. 3 for which data has been collected reflecting measurements of the oxide aperture made by II-VI of the VCSEL products referenced in Requests 1(a)-(h) above.**  It is industry standard to collect this this information in order to maintain production yield, reduce cost, and ensure that products operate within specifications.  This information is one piece of evidence necessary to verify the fraction of VCSEL products with oxide apertures greater than 8 microns, which determines how many of the final products infringe literally and how many infringe under the doctrine of equivalents.  This

19

4839-0505-3982.1

evidence is relevant to show how many VCSELs used by IPtronics' customers in the infringing optical communication networks infringe literally and how many infringe under the doctrine of equivalents.

5.     **Documents from the most recent three-month period on or before June 24, 2013 for which data has been collected reflecting the specifications related to binning VCSEL products referenced in Requests 1(a)-(h) above.**  It is industry standard to bin VCSEL products based upon oxide aperture size.  As a VCSEL manufacturer, II-VI would use this information to separate its oxide VCSELs for use in different products, depending on the measure oxide aperture size of the VCSEL.  This information is one piece of evidence necessary to verify the fraction of VCSEL products with oxide apertures greater than 8 microns, which determines how many of the final products infringe literally and how many infringe under the doctrine of equivalents.  This evidence is relevant to show how many VCSELs used by IPtronics' customers in the infringing optical communication networks infringe literally and how many infringe under the doctrine of equivalents.

6.     The most current final **electronic model used by II-VI to simulate the electrical performance characteristics of each VCSEL listed above in Request No. 1 (a)-(h) above, including SPICE or CADENCE models, and the related electronic files necessary to include the VCSEL model in an electronic simulation of a circuit containing the VCSEL, including a circuit model created using SPICE or CADENCE modeling software.**   This evidence is necessary in order to create an electronic simulation of the VCSEL and VCSEL Driver circuit that includes the II-VI electronic model for the specific II-VI VCSELs included in the accused products, in order to prove infringement of the asserted claims of the '456 patent, each of which requires that the electrical Drive Waveform generated by the VCSEL Driver Circuit to power the VCSEL includes a Negative Peak Portion, as described above.

### b.     Purpose of the Evidence to Be Obtained (Art. 3(d))

Avago seeks evidence from Mr. Karlheinz Gulden and II-VI in connection with its allegations that IPtronics has contributorily infringed and actively induced infringement of one or

more claims of the '447 Patent and the '456 Patent, and directly infringed one or more claims of the '456 Patent.  Further explanation as to why each evidence requested is necessary is detailed in the section above.  See Sections 7.a. – 8.a.

**10.    Questions to be Put to the Persons to be Examined or Statement of the Subject-Matter About Which They are to be Examined (Art. 3(f))**

A list of questions to be asked of the witnesses is set forth on Schedule A, annexed hereto.

**11.    Documents or Other Property to be Inspected (Art. 3(g))**

The documents to be inspected are set forth in section 8.a., above.  It is requested that the Court conducting the taking of evidence requests the production of documents and, if necessary, applies compulsory measures according to Article 167 of the Swiss Civil Procedure Code.

**12.    Requirement That the Evidence be Given on Oath or Affirmation (Art. 3(h))**

The witnesses should be examined under oath or affirmation.

**13.    Special Methods or Procedures to be Followed (Art. 3(i) and 9)**

This Letter Request includes the following requests:

- That this Letter Request be granted and the evidence-taking proceeding be performed on an expedited basis because the evidence cut off date in the underlying case is on March 2, 2015;

- That attorneys for the Plaintiff, and, if the Defendants so choose, attorneys for the Defendants be permitted to ask the witnesses additional questions that are related to those questions set forth in Schedule A;

- That the testimony shall be placed in full on record. In addition the statement shall be recorded on tape or by video in accordance with Article 176 of the Swiss Civil Procedure Code.

- That, to the extent that multiple hearing dates are necessary to complete all the questions in Schedule A and the additional questions related to those questions set forth in Schedule A, the hearings are scheduled on consecutive days or as close to each other as reasonably practicable;

21

4839-0505-3982.1

In the event the evidence cannot be taken in the manner or location requested, it is to be taken in such a manner or location as provided by local law.   To the extent any request in this section is deemed incompatible with Swiss principles of procedural law, it is to be disregarded.

**14.     Request for Notification of the Time and Place for the Execution of the Request and Identity and Address of Any Person to be Notified (Art. 7)**

Please notify the following counsel regarding the time and place for the execution of the Letter Request:

John C Vetter
Foley & Lardner LLP
Two South Biscayne Boulevard, Suite 1900
Miami, FL 33151
Telephone: (305) 382-8424
Fax: (305) 482-8600
E-mail: jvetter@foley.com

Shawn E. McDonald
Ary Chang
3579 Valley Centre Drive, Suite 300
San Diego, CA  92130
Telephone: (858) 847-6700
Facsimile:  (858) 792-6773
E-mail: semcdonald@foley.com
E-mail: achang@foley.com

Marc Veit
LALIVE
Stampfenbachplatz 4
P.O. Box 212
8042 Zurich
Switzerland
Telephone:  +41 58 105 2100
Facsimile:  +41 58 105 2160
E-mail:  mveit@lalive.ch

Steven D. Hemminger
Xavier Brandwajn
Alston & Bird LLP
1950 University Avenue, 5th Floor
East Palo Alto, CA 94303
Email: steve.hemminger@alston.com
Email: xavier.brandwajn@alston.com

Brian Parker Miller

22

4839-0505-3982.1

Alston & Bird LLP
1201 W Peachtree St.
Atlanta, GA 30309
Email: parker.miller@alston.com

Thomas W. Davison
Alston & Bird LLP
950 F Street, NW
Washington, DC 20004-1404
Email: tom.davison@alston.com

**15.    Request for Attendance of Participation of Judicial Personnel of the Requesting Authority at the Execution of the Letter Request (Art. 8)**

No attendance of judicial personnel is requested.

**16.    Specification of Privilege or Duty to Refuse to Give Evidence Under the Law of the State of Origin (Art. 11(b))**

In addition to the privilege of the witness to refuse to give evidence under Swiss law, the privilege or duty of the witnesses to refuse to give evidence under the provisions of the Federal Rules of Civil Procedure shall apply, including if giving such evidence would (1) subject them to a real and appreciable danger of criminal liability in the United States, or (2) disclose a confidential and privileged communication between them and their respective attorneys.

**17.    Fees and Costs (Art. 14 and 26)**

Fees and costs incurred which are reimbursable under the Hague Convention shall be borne by Foley & Lardner LLP, Two South Biscayne Boulevard, Suite 1900, Miami, Florida 33151.

Date of Request:                    December 19, 2014

Signature and Seal of
Requesting Authority

_Paul S. Grewal_

Honorable Paul S. Grewal

REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE
CASE NO. 5:10-CV-02863-EJD

4839-0505-3982.1